**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BETH COURNOYER,<br><br>    *Plaintiff*,<br><br>v.<br><br>RCI, LLC,<br><br>    *Defendant*. | Civil Action No.: 15-cv-8397 (PGS)(LHG) |
| JERRY NOWLIN,<br><br>    *Plaintiff*,<br><br>v.<br><br>RCI, LLC,<br><br>    *Defendant*. | Civil Action No.: 15-cv-7997 (PGS)(LHG) |
| ERIC BOYENGER,<br><br>    *Plaintiff*,<br><br>v.<br><br>RCI, LLC,<br><br>    *Defendant*. | Civil Action No.: 15-cv-7789 (PGS)(LHG) |

| | |
|---|---|
| GEORGE TUHOWSKI and ARTHUR SCHUELER,<br><br>*Plaintiffs,*<br><br>v.<br><br>RCI, LLC,<br><br>*Defendant.* | Civil Action No.: 15-cv-8396 (PGS)(LHG)<br><br><br>**MEMORANDUM**<br>**AND**<br>**ORDER** |

**SHERIDAN, District Judge.**

**Facts and Procedural History**:

The facts for all four cases are essentially identical. All four were members of a putative class lawsuit filed on July 20, 2010 in this Court, named *Barton et al. v. RCI, LLC*, No. 10-3657, 2011 WL 3022238. In that case, RCI's motion to dismiss was denied, 2011 WL 3022238 (D.N.J. July 22, 2011) [ECF No. 32]. Then in March 2014, Plaintiff Barton's motion for class certification was denied [ECF No. 142].[1] Plaintiffs now assert claims individually against RCI.

Defendant, a limited liability company that maintains its principal place of business in New Jersey, operates a vacation exchange business. (Cournoyer Compl. ¶ 3). Defendant offers its members the ability to exchange timeshare intervals for "points" (the "Points Program"). Pursuant to the Points Program, members can then exchange these point values for a variety of services ("Partner Inventory"), including car rentals and airline tickets. (Id. ¶ 8).

Plaintiffs maintain that the ability to exchange points for international and domestic airfare was a particularly attractive aspect of the pitch because the upfront and total cost of

---

[1] It should also be noted that at oral argument for this matter, the attorneys, some of whom are the same attorneys from the *Barton* matter, agreed not to use discovery obtained in the *Barton* case on these cases. The Court has not reviewed the propriety of this arrangement.

acquiring plenty of points to acquire airfare over many years was less than the out-of-pocket costs one would have to pay on the open market for such airline tickets. (Id. ¶ 12).

Plaintiffs attended a sales pitch to join Defendant's Points Program at a Blue Bay Resort. Plaintiffs were handed portfolios containing information about the Points Program, and sales associates—whom Plaintiffs believed to be authorized representatives of Defendant's Points Program—provided a presentation. (Id. ¶¶ 8, 15). According to Plaintiffs, the sales associates reinforced the idea of using the Points Program to create customized vacations. (Id. ¶ 11, 13). After Plaintiffs purchased nights at a Blue Bay Resort, the sales associates gave Plaintiffs two separate contracts to sign-one contract from Blue Bay Resorts (the "Blue Bay Contracts") and one contract from RCI (the "RCI Contracts"). (Id. ¶16).

Plaintiffs contend that prior to June 2008, Defendant complied with all obligations under the Points Program. In the summer of 2008, however, Defendant began to deny Plaintiffs' attempts to exchange accumulated point values for Partner Inventory. In September 2008, Defendant mailed to all members who joined the Points Program through a Blue Bay Resort prior to February 29, 2008 a letter notifying all such members that Defendant was unilaterally imposing a 60,000 annual point value limit cap on Partner Inventory redemptions (the "Points Limit Cap Letter"). Plaintiffs claim that the 60,000 annual point limit is insufficient to obtain the international and domestic airfare that was promoted. Defendant stated in the Points Limit Cap Letter that Defendant was imposing the cap for several reasons, including "to preserve the integrity of the RCI network." (Id. ¶ 24-25).

Beth Cournoyer ("Cournoyer") is from Massachusetts. (Id. ¶ 2). She vacationed at the Blue Bay resort in Mexico in February 2008. She decided to purchase 2,472 nights for approximately $27,200. This equates to 7,000,704 RCI Points. (Id. ¶14). She signed a contract

3

for a 25 year membership with the Blue Bay Premier Club allowing her to stay at the resort a certain number of weeks a year without using any of her purchased nights. (Id. ¶ 16). The RCI Points Program was for an initial term of three years. (Id. ¶ 21). A few months after joining the RCI Points Program, she called RCI in July of 2009 to use points. RCI's "vacation guide" told her that there was a new cap of 60,000 points on the exchange of Points for Partner benefits. RCI mailed her a letter a few months later formally telling her that RCI was imposing the 60,000 annual point limit. (Id. ¶¶ 23-24). Cournoyer brings one count for violation of the New Jersey Consumer Fraud Act ("CFA").

Jerry Nowlin ("Nowlin") is from Alabama. (Nowlin Compl. ¶2). He vacationed at the Blue Bay resort in Mexico in November 2007. (Id. ¶ 7). He decided to purchase 2,684 nights for approximately $30,000. This equates to about 7,600,000 RCI Points. (Id. ¶ 14). He also signed a membership for the Blue Bay Premier Club for 25 years, and the Blue Bay Points Program had an initial term of three years. (Id. ¶¶ 16, 21). In January 2008, he exchanged points to reserve airline tickets. A few months later, he called RCI to exchange more Points. RCI's "vacation guide" told him that a new 60,000 annual cap had been imposed on the Points for Partners Inventory. He received the formal notification letter a few months later. (Id ¶¶ 23-25). Nowlin also brings one count for violation of the CFA.

Eric Boyenger ("Boyenger") is from California. (Boyenger Compl. ¶ 2). He vacationed at the Blue Bay resort in Mexico in April of 2006. (Id. ¶ 7). He decided to purchase 3,571 nights for approximately $40,750. This equates to about 10,000,000 RCI Points. (Id. ¶ 14). He also signed a membership for the Blue Bay Premier Club for 25 years. (Id. ¶ 16). In May 2006, he bought additional nights and merged his initial contract with the new one, giving him about 22,000,000 RCI Points. (Id. ¶ 22). In August 2007, he vacationed again at Blue Bay and spoke with a senior

4

member of the Blue Bay sales team; he bought another 3,575 nights for about $25,000 equating to 10,124,000 RCI Points. Mr. Bert Hurstfield, listed as "President" in the August 2007 Blue Bay contract, met with Plaintiff and signed several addenda to that contract. Boyenger called RCI to exchange more points in the summer of 2007, but RCI's "vacation guide" told him that a new 60,000 annual cap had been imposed on the Points for Partners Inventory. He received the formal notification letter a few months later. (Id. ¶¶ 24-27). Boyenger brings five counts: violation of the N.J. CFA; breach of the implied covenant of good faith and fair dealing; punitive damages; breach of contract; and violation of the Plain Language Act. The motion to dismiss against Boyenger is only for count 1, the CFA count.

George Tuohowski ("Tuohowski") and Arthur Schueler ("Schueler") are from Illinois. (Tuohowski Compl. ¶ 2). In January 2008, Plaintiffs vacationed at Blue Bay resort in Mexico. (Id. ¶ 8). Each Plaintiff purchased 2,066 nights for $24,000, which equates to 5,850,912 RCI Points. (Id. ¶ 15). They signed a membership at the Blue Bay Premier Club for 25 years, and the memberships in the RCI Points Program were for an initial term of three years. (Id. ¶¶ 17, 22). A few months after joining, Schueler called RCI to exchange points, and was told that a 60,000 annual cap had been imposed on the exchange of Points for Partners Inventory. Tuohowski also called RCI and was told the same. They received a formal later a few months later on the cap. (Id. ¶¶24-26). They bring one count for violation of the CFA.

**Legal Standard**:

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court is required to accept as true all allegations in the complaint, and all reasonable inferences that can be drawn therefrom, and to view them in a light most favorable to the non-moving party. *Oshiver v. Levin*, 38 F.3d 1380, 1384 (3d. Cir. 1994). To survive a motion to dismiss a complaint must

contain sufficient factual matter, accepted as true to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also, *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). In order to survive a motion to dismiss, the complaint must allege facts that give rise to a plausible claim, and raise the right to relief above the speculative level. *Ashcroft*, 556 U.S. 662, 664; and *Twombly*, 550 U.S. 544, at 555. The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant, Corp.*, 223 F.3d 165, 177 (cert. denied 531 U.S. 1149, 2001).

### Analysis:

### I. Fraud under CFA

Plaintiff (all Plaintiffs will be referred to as "Plaintiff" throughout, and the Court will use Cournoyer's Complaint as the representative example, since all of the complaints are practically identical for the purposes of this motion) alleges a CFA violation against RCI. Such a violation must meet the heightened pleading standard of Rule 9(b). See *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994). "In other words, the Rule 'requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *MZL Capital Holdings v. TD Bank*, 2015 WL 4914695, at *5 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 535, 534 (3d Cir. 1999). "The plaintiff must also allege who made the purported misrepresentations and what specific misrepresentations were made." *Wiatt v. Winston & Strawn, LLP*, 838 F. Supp. 2d 296, 316 (D.N.J. 2012) (internal quotations omitted).

Under the CFA, the Plaintiff must establish: "(1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendant's unlawful conduct and the Plaintiffs' ascertainable loss." *Mladenov v. Wegmans Food*

*Mkts., Inc.*, 2015 WL 5023484, at *8 (D.N.J. Aug. 26, 2015). Three different types of unlawful conduct are covered under the CFA: (1) affirmative representations; (2) knowing omissions; and (3) regulation violations. *Id.* To make a claim based on actionable omissions, a plaintiff must establish that defendant acted with knowledge. *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994). "Knowledge and intent are exempt from Rule 9(b)'s particularity requirement, so long as the circumstances surrounding such general allegations of knowledge suffice to infer what defendant is alleged to have known and when." *Peruto v. Timbertech Ltd.*, 2015 WL 8664276, at *4 (D.N.J. Dec. 10, 2015).

RCI argues that the Complaint lacks any misrepresentations. According to RCI, there is no indication that anyone at Blue Bay ever said that RCI would not place any limitations on the Points Partner benefits or that the benefits would stay the same during the 25-year agreement. Also, the contract had a term of three years. The Complaint says nothing about the date or location of the sales pitch, or who the sales person/legal representative was, according to Defendant. Moreover, RCI claims that the Complaint does not plead scienter with particularity, other than conclusory allegations that RCI "regretted the bargain it struck." (Compl. ¶ 25).

In response, Plaintiff states that the date and parties involved are clear. The Complaint says that the sales pitch occurred in February 2008 at a Blue Bay resort in Mexico. (Compl. ¶ 7). The Court agrees that the allegations here are specific enough with regard to date and time. It is also clear who was responsible for the alleged misrepresentations, so as to inject "some precision or some measure of substantiation into the allegations," and to "place the defendant on notice of the precise misconduct…" *Carrier v. Bank of America*, 2014 WL 356219, at *3 (internal quotations omitted). Plaintiff says there were misrepresentations because she was told about a program involving future points, no mention was made of a cap, and this later changed.

Also, Plaintiff claims that she has met the omission standard here. "A plaintiff who asserts a fraud claim based on omission must 'allege what the omissions were, the person responsible for failing to disclose the information, the context of the omission, and the manner in which it misled plaintiff and what the defendant obtained through fraud.'" *Henderson v. Volvo Cars of N. Am.*, 2010 WL 2925913, *5-6 (D.N.J. July 21, 2010). In *Volvo*, the court found that Volvo knew about a design defect causing transmission problems, but failed to disclose it, and that was enough for a CFA claim. *Id.* at *5. Plaintiff argues that the short period of time between the purchase and the start of the cap policy could plausibly create an inference of intentional concealment. Such a policy had to be in preparation for several months, and there should have been some disclosure, according to Plaintiff. Also, Plaintiff only found out about the cap when she called RCI, and only later did she receive a written notice.

However, RCI explains that under the CFA, "statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." *Campmor, Inc. v. Brulant, LLC*, 2011 WL 2745922, at *12 (D.N.J. July 12, 2011). "[A] promise may constitute a misrepresentation only if the promiser knew at the time the promise was made that it could not or would not be fulfilled…The mere non-performance of a promise is not fraud." *Bubbles N' Bows, LLC v. Fey Pub. Co.*, 2007 WL 2406980, at *9 (D.N.J. Aug. 20, 2007). Similarly, in *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 430, 433-36 (D.N.J. 1998), the court dismissed a fraud claim on summary judgment where plaintiff alleged that insurance agents had indicated that an underwriting program could continue in "perpetuity" and was a "lifetime commitment" because "predictions of the future, which were believed when made, cannot serve as a basis for a fraud claim just because they subsequently turn out not to be true." 991 F. Supp. at 430, aff'd 172 F.3d

859 (3d Cir. 1998). Moreover, according to RCI, there are no allegations that anything was false or misleading about the RCI written materials, since the Program still exists and Plaintiff can exchange 45,000 points for airfares.

Plaintiff's omission argument also fails, according to RCI, because, "[p]leading of scienter sufficient to satisfy Rule 9(b) may not rest on a bare inference that a defendant 'must have had' knowledge of the facts or 'must have known' of the fraud given his or her position in the company." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006). RCI claims that the *Volvo* case is distinguishable because there were specific allegations of "widespread" complaints before the sale of the vehicle in that case, and defendant issued bulletins to address the "known problem," which was enough to infer scienter. 2010 WL 2925913, at *1 (D.N.J. July 21, 2010). Here, there are no specific allegations that RCI knew it was going to impose a cap more than eight months later and intentionally withheld that.

RCI argues that the alleged misrepresentation was true when made. *See Helena Chem. Co. v. Nelson*, 2000 WL 963911, at *8 (D.N.J. June 22, 2000) (dismissing NJCFA claim because "there is no evidence of record that [defendant's] statements were false at the time he made them"); aff'd, 28 F. App'x 120 (3d Cir. 2002). When the timeshare was purchased, her ability to exchange her timeshare was not restricted, according to RCI. The Participation Agreement had provisions stating that the points program could change, such as saying that membership should "not to be based on the anticipated benefits of the network" (Lambert Decl, Ex. A, at § 19(d)(v)), and "The Network Administrator shall not be required to make Partner Inventory available, but may do so in its discretion" (Id. at § 16). The Agreement also said that the Partner Inventory "may be changed, eliminated or added to without prior notice to Members." (Id. at § 22).

Plaintiff, in response, asserts that the Participation Agreement does not refute the misleading information, because nothing in the Agreement reveals that RCI would cap the point exchanges at 60,000 for Partner Inventory. In the *Barton* opinion, this Court stated: "A review of the RCI Contracts demonstrate that the RCI Contracts *do not* specifically provide for Defendant's unilateral right to place a cap on the Points Program." *Barton*, 2011 WL 3022238, at *6. There is one part of the contract that speaks to the possibility of "RCI restricting Members' ability to access Partner Inventory." (Id. at ¶ 25). However, in its entirety, that clause states that restrictions can only be made to "ensure the continuing integrity of the Network," according to Plaintiff. (Id). Plaintiff claims that RCI was not seeking to protect the integrity of the Network, but attempting to make a better deal for itself. At the most, this clause is ambiguous and should not be decisive at this stage in the proceedings.

Another clause states that, "The Network Administrator anticipates the offering of Partner Inventory. The Network Administrator shall not be required to make Partner Inventory available, but may do so in its discretion." (Id. at ¶ 16). Plaintiff claims that this clause does not use any words indicating a right to cap. Section 6(e) says: "All Reservations are contingent upon the Member requesting the Reservation and having sufficient RCI Points to obtain the desired Vacation Time or Partner Inventory." (Id. at ¶6(e)).

Defendant asserts that *Urbino v. Ambit Energy Holdings, LLC*, 2015 WL 4510201, at *3 (D.N.J. July 24, 2015) is analogous. In *Urbino*, the plaintiff allegedly switched service providers based on the representations that a company's rates were "low" and consistent." 2015 WL 4510201, at *1. However, the plaintiff's electric bill increased after enrolling. The court dismissed the CFA claim because the written contract permitted the defendant to change its prices, undercutting the misrepresentation and omission allegations. *Id.* at *4-5. Similarly, here,

10

the Terms and Conditions state that RCI reserved its right to change the Partner Inventory and that RCI, "shall not be required to make Partner Inventory available, but may do so in its discretion." Also, the Inventory "may be changed, eliminated or added to without prior notice to Members." (Lambert Decl, Ex. A, at §§ 16, 22, 25).

Plaintiff also asserts that the sales pitch had the capacity to mislead her, even if the statements were technically true when made. *See Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17 ("The capacity to mislead is the prime ingredient of all types of consumer fraud."). Also, the purpose of the program was for Plaintiff to prepay for "future" vacations.

The facts here are not much different from those in *Barton*. As stated in *Barton*, the contract does not state that there is a unilateral right to cap the Points Program. In regard to the provision that, "the Network Administrator shall have the right to take such actions…to ensure the continuing integrity of the Network," this Court found it unlikely that plaintiffs understood what "network integrity" meant. Moreover, according to the Complaint, "The sales person explained that Plaintiff would be able to accelerate his Point usage, meaning that he could use all of his Points at one time or spread them out over the term of his membership." (Compl. ¶ 12). The CFA is meant to address "sharp practices and dealings in the marketing of merchandise…whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive, or other similar kind of selling or advertising practices." *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 271 (1978). These statements may be deceptive. Also, *Urbino* is distinguishable because energy prices, by their nature, fluctuate. At the motion to dismiss stage, the Court finds that Plaintiff has made a plausible CFA claim.

**II. Agency**

RCI asserts that Plaintiff cannot establish that Blue Bay was RCI's agent. *See Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 121 (E.D.N.Y. 2011) ("[W]here, as here, the agency relationship is an integral element of an alleged fraud, courts have required the facts establishing agency to be pled with Rule 9(b) particularity."). Furthermore, "A necessary element of an agency relationship is the right of the principal to control the conduct of the agent." *Kernan v. One Washington Park Urban Renewal Assocs.*, 154 N.J. 437, 453 (1998).

RCI argues that the Complaint does not plead reasonable reliance. "[W]here a third party has reason to know authority does not exist, or once having existed has now been revoked, the agent's acts are ineffective and they do not bind the principal." *D & G Equip. Co. v. First Nat'l Bank*, 764 F.2d 950, 955 (3d Cir. 1985) (internal citation omitted). RCI explains that the Terms and Conditions reveal that Blue Bay and RCI are "separate and distinct entities" offering "separate and distinct" services, and they are not engaged in a "joint venture, partnership or agency relationship." (Lambert Decl., Ex. A, at § 19(d)(i-iii)). The documents also stated that Blue Bay was not authorized to make representations about the Points Program and that RCI would "not be responsible for the acts or omissions and/or representatives (whether oral or written)" of Blue Bay. (Id. at §§17(c), 19(d)(i), 22, 29(e)(i), 29(e)(ii)). *See Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 514 (D.N.J. 2009) ("Where a CFA claim is based upon an allegedly incomplete or misleading disclosure, and where the parties' agreement 'contains the very information that Plaintiffs allege was misrepresented, suppressed, or concealed,' dismissal for failure to state a claim is appropriate.")

A finder of fact must consider the totality of the circumstances to determine an agency relationship. Such a relationship exists when one party agrees to have another act on its behalf, with the agent acting at the direction and control of the principal. *Sears Mortg. Corp. v. Rose,*

134 N.J. 326, 337 (1993). Plaintiff believed that the sales representative had the authority to enroll her in RCI's program and was acting as RCI's agent. (Compl. ¶ 15). Also, Plaintiff claims that the sales agent gave her RCI materials, including a Points pamphlet and RCI catalogue; and the agent told her stories of other members who use the Program, indicating a familiarity with how the program functions after sale. (Id. ¶¶ 9-13). Moreover, someone introduced themselves as the "legal representative" and gave her the RCI Network Participation Agreement, and then the staff signed the contract on RCI's behalf. As this Court explained in the *Barton* opinion, the printed materials had the name RCI on them, and they mentioned the RCI Points Program. Plaintiff claims that she believed that the sales person represented RCI, and the Court finds that under all of these circumstances, it is reasonable for Plaintiff to have had this belief.

## ORDER

This matter having come before the Court on Motions to Dismiss by Defendant RCI, Inc., and the Court having considered the submissions of the parties, having heard oral argument, for the reasons set forth on the record, and for good cause shown,

It is, on this ___11___ day of April, 2016, hereby

**ORDERED** that the Motions to Dismiss for 15-cv-8397 [ECF No. 10], 15-cv-7997 [ECF No. 7], 15-cv-7789 [ECF No. 7], and 15-cv-8396 [ECF No. 7] are **DENIED**.

_____
PETER G. SHERIDAN, U.S.D.J.